```
            IN THE UNITED STATES DISTRICT COURT FOR THE
            NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MATTHEW CLARK and GREGORY          )
MALANDRUCCO,                       )
                                   )
      Plaintiffs,                  )
                                   )    Case No. 10-cv-1803
v.                                 )
                                   )
CITY OF CHICAGO, OFFICER BRIAN     )    Judge Der-Yeghiayan
POSTRELKO, OFFICER MICHAEL         )
TORRES, OFFICER NELSON CRESPO,     )    Magistrate Judge Cox
OFFICER JOHN REPPAS, OFFICER       )
ELISE MIDDLETON, OFFICER RICK      )
PODGORNY, OFFICER DONALD           )
SHROEDER, UNKNOWN PLAINCLOTHES     )    JURY TRIAL DEMANDED
CHICAGO POLICE OFFICERS, and       )
UNKNOWN UNIFORMED CHICAGO          )
POLICE OFFICERS,                   )
                                   )
      Defendants.
```

## FIRST AMENDED COMPLAINT

Plaintiffs, Matthew Clark and Gregory Malandrucco, by and through their attorneys, LOEVY & LOEVY, complain of the violation of Plaintiffs' constitutional rights by Defendants, City of Chicago, Officer Brian Postrelko, Officer Michael Torres, Officer Nelson Crespo, Officer John Reppas, Officer Elise Middleton, Officer Rick Podgorny, Officer Donald Shroeder, Unknown Plainclothes Chicago Police Officers and Unknown Uniformed Chicago Police Officers (collectively, "Defendant Officers"), and allege as follows:

## Introduction

1.   Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to vindicate the violation, under color of state law, of Plaintiffs' rights secured by the United States Constitution.

2.   Plainclothes Chicago Police Officer Defendants (henceforth, "Plainclothes Officer Defendants") brutally beat Plaintiffs without any justification or provocation, fracturing Plaintiffs' noses and rendering them unconscious.  Plainclothes Officer Defendants, along with Officers Postrelko, Torres, Crespo, Reppas, Middleton, Podgorny, Shroeder, and other Unknown Uniformed Chicago Police Officers who responded to the scene (henceforth "Uniformed Officer Defendants"), left Plaintiffs in a parking lot without providing any medical assistance despite their obvious need of it.  At least two nearby surveillance cameras captured this violent and unprovoked beating on video.

## Jurisdiction and Venue

3.   This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and over their state law claims pursuant to 28 U.S.C. § 1367.

4.   Venue is proper because Defendant Officers are believed to reside in this jurisdiction and the City of Chicago is a municipal corporation within this district.  Moreover, all of the events giving rise to the claims asserted herein occurred within this district.

**Parties**

5.    Plaintiff Matthew Clark is thirty-seven years old and employed full-time as a consultant with a management consulting firm.  He has a Ph.D. from the University of Chicago and is a resident of the City of Chicago.

6.    Plaintiff Gregory Malandrucco is thirty-two years old and currently pursuing a Ph.D. at the University of Chicago, where he also is employed as a lecturer.  He is also a resident of the City of Chicago.

7.    Defendant City of Chicago ("City") is an Illinois municipal corporation that operates the Chicago Police Department ("Department").

8.    Officer Brian Postrelko, Star No. 12624, responded to the scene at Arturo's Tacos while Plaintiffs were present.  Officer Postrelko is currently employed by the Chicago Police Department.  On information and belief, Officer Postrelko is a resident of Cook County.

9.    Officer Michael Torres, Star No. 13888, responded to the scene at Arturo's Tacos while Plaintiffs were present.  Officer Torres is currently employed by the Chicago Police Department.  On information and belief, Officer Torres is a resident of Cook County.

10.   Officer John Reppas, Star No. 4297, responded to the scene at Arturo's Tacos while Plaintiffs were present.  Officer

Reppas is currently employed by the Chicago Police Department. On information and belief, Officer Reppas is a resident of Cook County.

11. Officer Nelson Crespo, Star No. 10914, responded to the scene at Arturo's Tacos while Plaintiffs were present. Officer Crespo is currently employed by the Chicago Police Department. On information and belief, Officer Crespo is a resident of Cook County.

12. Officer Elise Middleton, Star No. 19888, responded to the scene at Arturo's Tacos while Plaintiffs were present. Officer Middleton is currently employed by the Chicago Police Department. On information and belief, Officer Middleton is a resident of Cook County.

13. Officer Rick Podgorny, Star No. 19970, responded to the scene at Arturo's Tacos while Plaintiffs were present. Officer Podgorny is currently employed by the Chicago Police Department. On information and belief, Officer Podgorny is a resident of Cook County.

14. Unknown Plainclothes Officer Defendants and Unknown Uniformed Officer Defendants are all Chicago Police Officers.

15. At all times relevant to this Complaint, the Defendant Officers acted under color of law as police officers of the City of Chicago and acted within the scope of their employment.

**Factual Allegations**

16.   Plaintiffs, friends who met at the University of Chicago, went out on the night of Saturday, February 6, 2010.

17.   On their way home, Plaintiffs stopped at Arturo's Tacos, 2001 N. Western Avenue, Chicago, Illinois 60647, for a bite to eat.  At approximately 3:00 a.m. on February 7, 2010, Plaintiffs finished their meal and decided to go home.

18.   While standing up to leave, Mr. Malandrucco encountered two male Plainclothes Officer Defendants and one female Plainclothes Officer Defendant, who had also been dining at Arturo's Tacos.

19.   One of the male Plainclothes Officer Defendants shoved Mr. Malandrucco and glared at him because Mr. Malandrucco had unintentionally obstructed the Plainclothes Officer Defendants' path to the cashier or exit.

20.   Mr. Malandrucco told the Plainclothes Officer Defendant that he was putting on his coat and would get out of his way shortly.

21.   The Plainclothes Officer Defendants then exited Arturo's.

22.   Plaintiffs paid for their meal and exited Arturo's. Plaintiffs walked out to their car, which was parked in the parking lot behind Arturo's.

23. Once in the parking lot, Plaintiffs again encountered the Plainclothes Officer Defendants, who were waiting in the Arturo's parking lot near their parked car.

24. The Plainclothes Officer Defendants approached Plaintiffs and began to yell at them in an aggressive manner.

25. Plaintiffs attempted to calm the Plainclothes Officer Defendants by offering to shake hands, make peace, and suggesting that everyone go home since nothing had happened.

26. Without warning, the male Plainclothes Officer Defendants punched Mr. Clark and began to repeatedly strike him, throwing him to the ground.

27. The Plainclothes Officer Defendants proceeded to hold Mr. Clark down and brutally beat him, until he lost consciousness.

28. Mr. Clark did not fight back once during the beating, but tried to protect himself as best he could.

29. When Mr. Clark raised his arms to try to protect his face from the punches, the female Plainclothes Officer Defendant, who was with the two male Plainclothes Officer Defendants, stood over Mr. Clark while he was being beaten and shouted, "They're cops—They're going to beat your ass", or words to that effect.

30. Witnessing the unprovoked brutality of the two male Plainclothes Officer Defendants, Mr. Malandrucco attempted to prevent them from continuing to beat Mr. Clark.

31. The two male Plainclothes Officer Defendants responded by beating Mr. Malandrucco.  These Defendants threw Mr. Malandrucco to the ground, hitting his head against the concrete and knocking him unconscious.

32. After some minutes during which the Plainclothes Officer Defendants continued to use force against Plaintiffs, the Uniformed Officer Defendants arrived on the scene in marked squad cars.  These Uniformed Officer Defendants proceeded to join in the unreasonable seizure of Plaintiffs.

33. One or more of the Uniformed Officer Defendants saw that one of the Plainclothes Officer Defendants was hitting Mr. Malandrucco without justification as Mr. Malandrucco was lying face-down on the ground.

34. One of the Uniformed Officer Defendants switched places with the Plainclothes Officer Defendant who was on top of Mr. Malandrucco, holding him down and striking him in the process.

35. Another one of the Uniformed Officer Defendants kicked or kneed Mr. Malandrucco.

36. One or more of the Uniformed Officer Defendants found Mr. Clark sitting on the ground, barely conscious, in shock and

7

in pain.  Mr. Clark was bleeding profusely from the wounds on his head.  Mr. Malandrucco was also bleeding from the wounds on his face.

37.  Subsequently, Plaintiffs begged one or more of the Uniformed Officer Defendants to do something to help them because they had been attacked without provocation or justification and were seriously injured.

38.  One or more of the Uniformed Officer Defendants refused.  They told Plaintiffs "we're not going to do a thing to those guys," referring to the Plainclothes Officer Defendants, or words to that effect.  One or more of the Uniformed Officer Defendants proceeded to escort the Plainclothes Officer Defendants towards their car and allowed them to leave the scene without questioning them or documenting the attack.

39.  One or more of the Uniformed Officer Defendants told Plaintiffs to go home and forget the incident ever happened.

40.  Rather than assisting Plaintiffs, the Uniformed Officer Defendants then returned to their squad cars and left the scene, despite Plaintiffs' obvious need for medical attention.

41.  None of the Defendant Officers did anything to provide medical assistance to Plaintiffs.

42. At no point did Plaintiffs take any action to justify the Defendant Officers' unreasonable seizure and excessive use of force. Plaintiffs were detained and attacked for no reason.

43. Plaintiffs were thereafter transported by ambulance to St. Mary and Elisabeth Medical Center, 2233 West Division Street, Chicago, Illinois, where Plaintiffs received medical attention for their injuries.

44. As a result of Plainclothes Officers' beating, Mr. Clark was found to have a fractured nose, a laceration in his forehead, several smaller lacerations on his face, and a lacerated lip requiring three stitches. A CT scan was ordered by the physician on duty because Mr. Clark had been knocked unconscious. In addition, Mr. Clark suffered injury and bruising to his eyes, ears, elbow, calf, and hip.

45. Mr. Clark continues to suffer pain in his elbow and hip due to the Plainclothes Officers' attack, and at six weeks after the attack still has a visible scar on his forehead and lip.

46. As a result of Defendant Officers' beating, Mr. Malandrucco suffered a fractured nose, multiple lacerations on his face, and he received two stitches to repair a laceration in his lip. Mr. Malandrucco suffered a laceration to his forehead, as well as injury to his knees and elbows, and a concussion.

47. As a result of the Defendant Officers' beatings, Plaintiffs have suffered physical injuries and have incurred thousands of dollars in medical bills to treat their physical injuries.

48. Because of their injuries, both Plaintiffs missed a week of work, and were unable to work outside of the home for an additional week, due to their appearance and the emotional trauma suffered.

49. Plaintiffs continue to suffer emotional trauma as a result of Defendant Officers' actions. Contrary to the Chicago Police Department's stated mission to "Protect and Serve," Plaintiffs fear the police and cannot trust that they will be protected by the Department.

50. Plaintiffs have sought counseling to help them cope with the emotional trauma they have experienced as a result of being beaten by the Defendant Officers and not assisted in any way by the Uniformed Defendant Officers.

51. The Defendant City of Chicago maintains a *de facto* policy, practice, and custom of failing to train, supervise, discipline, and control its on- and off-duty police officers. As a matter of both policy and practice, Defendant City of Chicago facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instances of similar misconduct, thereby leading Chicago Police Officers to

believe their actions will never be scrutinized, and in that way, directly encouraging future abuses such as those affecting Plaintiffs; specifically, Chicago Police Officers accused of excessive force can be confident that the Office of Professional Standards ("OPS"), now known as the Independent Police Review Authority ("IPRA"), will not investigate those accusations in earnest and will refuse to recommend discipline even where the Officer has engaged in excessive force.

52. Municipal policymakers have long been aware of the City of Chicago's policy and practice of failing to properly train, monitor, and discipline its police officers:

    a. Following two high profile, unjustified police shootings in 1999, the City Council held public hearings. On September 28, 1999, then-Superintendent of the Chicago Police Department Terry Hillard gave a speech highlighting the problems with the City of Chicago's policies and practices relating to the use of force. Superintendent Hillard specifically noted the need for (1) better in-service training on the use of force; (2) early detection of potential problem officers, and (3) officer accountability for the use of force.

    b. In a review commissioned by the Superintendent, John Marshall Law School found that although the City of Chicago's policies on the use of force were in compliance

with the law, more training of police officers was necessary.

    c. Moreover, in January 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

    d. A study performed a year later by the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed that resolution. Specifically, the JCGC study concluded that the Chicago Police Department lacked many of the basic tools necessary to identify, monitor, punish and prevent police misconduct and brutality. The JCGC findings were presented to Mayor Daley, Superintendent Hillard and the Chicago Police Board.

    e. Two years later, *Garcia v. City of Chicago*, 2003 WL 22175618, *2 (N.D. Ill. Sept. 19, 2003) affirmed that the City's police misconduct investigations were systematically "incomplete, inconsistent, delayed, and slanted in favor of the officers" and as a result, fostered a culture of impunity within the Chicago Police Department. Moreover, evidence at the *Garcia* trial further showed that

the Chicago Police Department's handling of allegations of off-duty police officer violence was "defective" and "insufficient" in that "investigations were incomplete, inconsistent, delayed, and slanted in favor of the officers; investigative leads were not pursued; incidents were covered-up; evidence was destroyed; officers were not arrested; and private citizens were discouraged from filing complaints about police officer misconduct." *Id.*

    f.   Indeed, by its own accounting, in 2004 the City of Chicago sustained only four percent of the complaints brought against police officers for use of excessive force. An even smaller percentage of officers were actually disciplined for such conduct.

53. Although the City of Chicago has long been aware that its supervision, training, and discipline of police officers is entirely inadequate, it has not enacted any measures to address that failure.

54. In 1996, the City of Chicago intentionally abandoned a program designed to track police officers repeatedly acting in an abusive manner because of opposition by the Fraternal Order of Police. The City promptly deleted all data contained in the program, including the list of problem officers.

55. In 2000 and 2001, the City continued to refuse to implement a system allowing for detection of repeat police

officer-offenders, despite the fact that the Commission on Accreditation for Law Enforcement Agencies adopted a standard mandating such a detection system for large agencies such as Chicago.

56. In 2003, although the City of Chicago and the Fraternal Order of Police negotiated a new contract allowing the Chicago Police Department to use unsustained OPS cases “to identify patterns of suspected misconduct about which the public and regulatory agencies are so intensely and legitimately concerned,” no such pattern analysis has ever been implemented. Indeed, pursuant to that contract, OPS records are only kept for seven years, precluding any meaningful long-term analysis of an officer’s misconduct.

57. Finally, the City’s training of its officers has not changed since 1999, despite repeated promises by the City and City policymakers for a more comprehensive training program.

**Legal Claims**

58. In the manner described above and more fully below, the Defendant Officers violated Plaintiffs’ constitutional rights. The Defendant Officers violated, among others, Plaintiffs’ rights under the Fourth, Fifth, and Fourteenth Amendments. The Defendant Officers’ conduct, described herein, also constitutes violations of Illinois law. The Defendant Officers’ conduct, described herein, was objectively

unreasonable and was undertaken intentionally with malice, willfulness, wantonness, and reckless indifference to the rights of others.

59.   The conduct of the Defendant Officers toward Plaintiffs constituted excessive force in violation of the United States Constitution.

60.   The Defendant Officers unlawfully seized and detained Plaintiffs without lawful justification, in violation of the United States Constitution and Illinois law.

61.   Despite having actual knowledge of Plaintiffs' serious medical conditions, the Defendant Officers failed to provide Plaintiffs with medical attention.  In this manner, the conduct of the Defendant Officers was objectively unreasonable and deliberately indifferent to Plaintiffs' objectively serious medical needs.

62.   One or more of the Defendant Officers failed to intervene to prevent harm to Plaintiffs from the numerous unconstitutional acts committed by their fellow Police Officer Defendants, in violation of the United States Constitution. Specifically, one or more of the Defendant Officers had a reasonable opportunity to prevent another Officer from committing excessive force against Plaintiffs but failed to do so.  One or more of the Defendant Officers also had a reasonable

opportunity to prevent another Officer from denying medical care to Plaintiffs, but they failed to do so.

63. Plaintiffs' injuries were proximately caused by the policies and practices on the part of Defendant City of Chicago for failing to train, supervise, discipline, and control its police officers. Indeed, the Defendant Officers' misconduct was undertaken pursuant to the City's policy and practice in that:

 a. As a matter of both policy and practice, the City directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise, and control its officers, such that its failure to do so manifests deliberate indifference;

 b. As a matter of both policy and practice, the City facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instances of similar misconduct, thereby leading Chicago Police Officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those affecting Plaintiffs; specifically, Chicago Police Officers accused of excessive force can be confident that IPRA will not investigate those accusations in earnest and will refuse to recommend discipline even where the Officer has engaged in excessive force;

    c.    Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Chicago Police Department abuse citizens in a manner similar to that alleged by Plaintiffs on a frequent basis, yet the Chicago Police Department and IPRA make findings of wrongdoing in a disproportionately small number of cases;

    d.    Where citizens complain to the Chicago Police Department that they have been subjected to criminal violations by Chicago Police Officers, the Department's policy and practice is to affirmatively discourage those persons from pursuing criminal charges against the offending police officers; the City's training in that regard is equally deficient.  This policy and practice and lack of adequate training encourages Chicago Police Officers, such as the Defendants in this case, to use violence without fear of legal consequences.

    e.    Municipal policymakers are aware of, and conduct and facilitate by their inaction, a "code of silence" in the Chicago Police Department, by which officers fail to report misconduct committed by other officers, such as the misconduct at issue in this case;

    f.    The City and the relevant policy makers have failed to act to remedy the patterns of abuse described

herein, despite actual knowledge of the same, thereby causing the types of injuries alleged here.

64. The Defendant Officers' actions also constituted an assault and battery under Illinois state law because their actions caused Plaintiffs reasonable apprehension of imminent harm, were intended to cause a harmful or offensive contact with the Plaintiffs, and such harmful or offensive contact occurred.

65. The Defendant Officers' actions constituted intentional infliction of emotional distress because their actions were extreme and outrageous, undertaken with the intent to inflict severe emotional distress or with knowledge that there was a high probability that their conduct would inflict such distress, and Plaintiffs suffered severe emotional distress as a result of Defendant Officers' misconduct.

66. The Defendant Officers entered into an agreement amongst themselves to deprive Plaintiffs of their constitutional rights and to participate in an unlawful act or act in an unlawful manner toward Plaintiffs, including by conspiring to unlawfully seize Plaintiffs, deny Plaintiffs medical attention, commit excessive force on Plaintiffs, assault and batter Plaintiffs, and intentionally inflict emotional distress upon them. One or more of the Defendant Officers took an overt act in furtherance of this conspiracy, all in violation of both state and federal law.

67. All of the Defendant Officers' actions were undertaken under color of law and within the scope of their employment such that their employer, Defendant City of Chicago, is liable for their actions.

68. Illinois law provides that Defendant City of Chicago must indemnify the Defendant Officers for any liability arising out of the scope of their employment activities. Accordingly, the City of Chicago must pay any tort judgment awarded to Plaintiffs for compensatory damages resulting from the Defendant Officers' actions.

69. Additionally, in committing the acts alleged in the preceding paragraphs, the Defendant Officers were members and agents of the Chicago Police Department acting at all relevant times within the scope of their employment. Defendant City is liable as principal for all torts committed by its agents.

WHEREFORE, Plaintiffs MATTHEW CLARK and GREGORY MALANDRUCCO, respectfully request that this Court enter judgment in their favor and against Defendants, CITY OF CHICAGO, OFFICER BRIAN POSTRELKO, OFFICER MICHAEL TORRES, OFFICER NELSON CRESPO, OFFICER JOHN REPPAS, OFFICER ELISE MIDDLETON, OFFICER RICK PODGORNY, OFFICER DONALD SHROEDER, UNKNOWN PLAINCLOTHES POLICE OFFICERS, and UNKNOWN UNIFORMED POLICE OFFICERS, awarding compensatory damages, costs, and attorneys' fees, along with

punitive damages against each of the individual Defendants in their individual capacities, as well as any other relief this Court deems appropriate.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

                                    RESPECTFULLY SUBMITTED,

                                    /S/ Heather Lewis Donnell
                                    Attorney for Plaintiff

Arthur Loevy
Jon Loevy
Russell Ainsworth
Elizabeth Wang
Heather Lewis Donnell
LOEVY & LOEVY
312 North May
Suite 100
Chicago, IL 60607
(312) 243-5900

                         CERTIFICATE OF SERVICE

    I, Heather Lewis Donnell, an attorney, hereby certify that on May 7, 2010 I served the foregoing document upon all counsel of record via the Court's electronic filing system.

                                    S/Heather Lewis Donnell